WENDELL ANDREAS

*v.*

HATTIE ANDREAS.

[Submitted February 10th, 1915. Decided February 15th, 1915.]

1. Evidence in a suit by a husband against his wife to recover securities by her without his knowledge or consent taken from his safe deposit box, to which both of them had access, being rented in the names of both husband and wife, she claiming the title thereto on the ground that they were the subject-matter of a gift from him to her.—*Held*, to show that there was no delivery of the subject-matter of the so-called gift, and on that account and for that reason, the gift was imperfect and is therefore void.

2. In cases relating to gifts, not only must there be shown that there was a donative intention on the part of the donor, but that there was also a delivery of the thing given, and this point of delivery includes a consideration of the subject-matter of the gift. The identification of the gift is part of the question of delivery, because there can be no delivery until the thing to be delivered has been ascertained.

---

On final hearing on bill, answer, replication and proofs.

*Mr. Arthur F. Egner,* for the complainant.

*Mr. William H. Carey* and *Mr. Edmunds Putney* (of the New York bar), for the defendant.

HOWELL, V. C.

This suit is brought by a husband against his wife to compel her to restore to him some securities which he says were taken by her in August, 1913, surreptitiously from his safe deposit box in the New Jersey Title Guarantee and Trust Company of Jersey City. The facts are these: The parties were married on April 8th, 1901; they lived together until August 23d, 1913, when the defendant left her husband and brought suit against him for divorce on the ground of adultery, which suit is still

pending. At the time of the marriage the husband had a large portion of his fortune invested in securities which came to him from his father's estate. They were kept by him in a safe deposit box in the Mercantile Safe Deposit Company in New York. To this box he alone at that time had access. On December 17th, 1904, the husband and wife appeared at the office of the safe deposit company and then and there the lease or memorandum of the box, which had up to that time stood in the name of the husband, was changed to "Wendell Andreas or Mrs. Hattie Andreas." At that time the wife was given a key which gave her access to the box and its contents without the presence of her husband. Both parties continued to have access to the box and its contents until some time in February, 1908, or thereabouts, when they gave up the box in the Mercantile Safe Deposit Company and rented one in the New Jersey Title Guarantee and Trust Company in Jersey City, to which all the securities were removed, and to which both parties had access, the same having been rented in the name of both husband and wife. After the defendant was given access to the securities in New York, she at times cut the coupons from the bonds; at other times this was done by the husband, but, by whomsoever it was done, the coupons were deposited in the husband's individual bank account in the Hackensack National Bank until some time in 1906, when that account was changed to a joint account of the husband and wife, against which both of them might draw. This state of facts continued until August, 1913, when the wife, accompanied by her counsel, went to the office of the safe deposit company in Jersey City and there, without the knowledge or consent of the husband, took from the said box somewhat over half in value of the securities therein deposited, and took the same into her own possession, where they now are. The husband discovered the loss in September, 1913, and, after some negotiation between the counsel for the respective parties, suit was brought as herein above stated. The other facts of the case will appear later on.

The wife claims title to the securities taken by her on the ground that they were the subject-matter of a gift from her hus-

band to her on December 17th, 1904. The facts in relation thereto are hereinafter stated more fully.

In cases relating to gifts not only must there be shown that there was a donative intention on the part of the donor, but that there was also a delivery of the thing given, and this point of delivery includes a consideration of the subject-matter of the gift. The identification of the gift is part of the question of delivery, because there can be no delivery until the thing to be delivered has been ascertained. In this case there is some discrepancy between the allegations of the pleadings and the proofs on this question of identification. In the answer of Mrs. Andreas she says:

"That in the latter part of the year 1904 the complainant gave to the defendant a *one-half interest in all the personal property* representing his share and interest in his father's estate,"

and that in the month of February, 1908, "the complainant and defendant agreed that thereafter each should hold his or her share of said property in severalty and independent of each other," a situation which would be impossible if the former allegation were true, unless there were an actual partition. In the cross-bill the allegation is

"that in the latter part of the year 1904 the complainant gave to the defendant *one-half of all the personal property representing his share and interest in his father's estate* then deposited in the safe deposit box rented by him in his name in the Mercantile Safe Deposit Company in New York City."

And that in the month of February, 1908, complainant and defendant agreed that thereafter each should hold his or her share of said property in severalty. These allegations leave it in doubt whether the defendant wished to say that she took an undivided one-half interest in the property which is the subject-matter of the suit as co-owner thereof with her husband, or whether she took a specific one-half of all the property so that it would be possible to set apart the property which belonged to her from the property which belonged to her husband. The testimony given by her fails to elucidate the point, but leaves it in

quite as uncertain a condition as do the pleadings. I extract the
following from her evidence:

"Q. Now, will you state what the conversation was between your hus-
band and yourself with respect to the securities and to any proposed
change of title?

"A. Just before that time he said he thought I should be independent
and should own *one-half of what was in the box;* he gave several reasons
for why I should be independent. He mentioned an accident to a friend
of ours of previous years in 1899; this friend, Mr. Burr, was thrown
off the trolley car.

"Q. What was the name?

"A. Louis Burr; he was thrown off the trolley car and he was out of
his mind several weeks, and Mr. Andreas said to me, 'if anything ever
happens to me like that you will have nothing to draw on. I think you
should own one-half with me.'

"Q. One-half of what?

"A. Of the bonds and stocks that were in the box then of the Mer-
cantile Safe Deposit."

On February 15th, 1908, *Exhibit D 2* was written by the hus-
band. It reads as follows:

"February 15th, 1908.

"An agreement between Wendell Andreas and Hattie Andreas his wife
signed this date covering the ownership of the stock and bonds in this
box will be found (if not in this box) in the small safe at the residence
of Wendell Andreas. The stock and bonds having been *owned jointly*
up to this date, are divided as per this agreement, each holding their
certificates independently of the other.

"WENDEL ANDREAS."

Concerning this agreement Mrs. Andreas testifies as follows:

"Q. At the time this was written you were with Mr. Andreas?

"A. I was.

"Q. At that time did you take out the safe deposit box?

"A. Yes, we took it out and took it in there and went over the things,
and he told me, 'I thought we should have more than the verbal agree-
ment,' that I owned one-half of what was in that box, and he wrote that
paper, and he said, 'Now that fixes it, so that you will have something
to show for what is in that box.'

"Q. Now had there been any conversation between you and your hus-
band about a more formal agreement.

"A. Yes, we had intended drawing up an agreement actually making
the physical division and showing which certificates were mine."

This leaves the question open both on the allegations of the pleadings and on the evidence whether the gift so called was a gift of an undivided interest or was a gift of specific items of property. The difference is not a mere quibble; it is a matter of substance and attaches to and becomes part of the transaction, and it likewise may affect the decision of the case on the point of delivery, because, if the gift so called was a gift of specific property, it would admit of one method of delivery, while if it was the gift of an undivided interest in property a very different method of delivery might be found to be necessary. It thus becomes a question of great importance, because nowhere in the evidence, so far as I have been able to find, is there any statement that there was an actual tradition of the actual specific property from the hand of the husband to the hand of the wife.

The evidence touching the question of delivery is very meagre and unsatisfactory. Prior to December 17th, 1904, the husband had kept the securities in question in a safe deposit box in the Mercantile Safe Deposit Company, in the city of New York; the box was rented in his name and he had always paid the rent for it himself. No one had access to it except himself, and it was to all intents and purposes his own private box. On that day the husband and wife went together to the place of business of the Mercantile Safe Deposit Company, and on being asked by her counsel to state what occurred, she said:

"We went down to the Mercantile Safe Deposit together; I went through the usual forms, and he directed that the title of the box be changed to my name, as well as his own, changed from his name to both of our names. He took the box into one of the coupon rooms, he opened the box and showed me just exactly what was in it, explained how to cut coupons; I had never seen coupons. He told me one-half of what was in that box at any time was mine."

Continuing, the evidence is as follows:

"Q. Did you take out and examine all of the securities?
"A. Yes.
"Q. Do you recall what was in the box at that time?
"A. I think I do.
"Q. Will you state?

"A. There were the sixty government bonds, there was the Second Avenue Railroad stock, the two thousand Michigan Central, twenty thousand D. C's.

"Q. D. C's, you mean?

"A. District of Columbia.

"Q. Do you recall anything else in the box at that time?

"A. Let us see, the District of Columbia, there was the Susquehanna and Western.

"Q. The Albany?

"A. Yes.

"A. The title to the farm, and all that, and the agreement with his mother.

"Q. Do you recall whether that was in there or not?

"A. Yes, I remember that.

"Q. Was anything said about that agreement at that time?

"A. Yes, he told me that was the agreement that had been drawn up shortly after we were married, or when they made their physical division.

"Q. And did he say anything about you having any interest in the property represented by that agreement?

"A. He told me I had one-half of everything that he had in that box."

The records relating to the title to the safe deposit box in the Mercantile company were kept on cards preserved in the card index form. They merely showed that on December 17th, 1904, Mr. Andreas surrendered the box which had previously stood in his name, and that a new lease or memorandum thereof was made to the husband "or" wife, to each of whom was delivered a key thereto, so that they both had access at will to the box and its contents.

It appears by the testimony that both husband and wife from time to time exercised their rights of access to the contents of the box, and that they each indifferently removed the coupons from the coupon bonds therein and took them for deposit in a bank account. This deposit was made in a bank account standing in the name of the husband in the Hackensack National Bank, and was so continued for about two years, when the account was changed to a joint account of the husband and wife against which either of them might draw. This continued down to the time of their separation. Meantime, and in October, 1908, they gave up the box in the Mercantile Safe Deposit Company and rented one in the New Jersey Title Guaranty and Trust Company in Jersey City, in the names of both, to which both had access.

The property remained there until August, 1913, when the wife removed somewhat over half the securities, which she says she now has in her possession.

From all these circumstances the court is asked to determine that there was a delivery of the so-called gift at the time it was made with the intention that it should take effect immediately, for nothing short of this would amount to a delivery. The burden of proof on this point is on the donee. It is admitted that prior to December 17th, 1904, the property in question was, undoubtedly and irrevocably, the property of the husband. To change the title of property of such great value at a private conference between the husband and wife manifestly requires of her as a claimant to the fund that she should overcome all the presumptions in favor of the donor, and all the husband's denials. This I do not think she has done on the question of delivery. The utmost point to which her case reaches is that it creates a doubt which she does not dispel. I am, therefore, of opinion that she must fail on this question.

But, besides the doubt which is thrown upon the subject-matter of the gift, both by the evidence and by the variation between the allegations and the proofs, there is one other circumstance to which I must allude. The evidence does not show that there was any attempt made at any time to deliver the subject-matter of the gift in such a way as to deprive the husband of all subsequent control over it. There was no manual delivery, no actual passing from hand to hand; the husband did not lose control. There was no time, until the wife removed a portion of the contents of the box, in August, 1913, when the husband could not have taken the securities into his own possession and have sold or made other disposition of them. Until that date they were always within his reach, under his control and subject to his volition, and for some time after the defendant was given access to the box, the income from all the securities represented by coupons was deposited in the husband's bank account. The correctness of this view is further strengthened by this piece of evidence. Among the other securities in the box at the time the wife was given access to it were twenty bonds issued by the District of Columbia, of the denomination of $1.000 each, which

were registered in the name of the husband. No change was ever made in the registration of these bonds until July 14th, 1910, when the husband sold them and delivered them to the purchaser. He shortly thereafter purchased some New York City bonds which were placed in the safe deposit box and kept there until August, 1913. No stronger evidence of the control by the husband of the bonds in question could be given. There were also some bonds issued by the Albany and Susquehanna railroad which matured on April 1st, 1906. They were paid off, and with the proceeds other New York City bonds were purchased. These bonds also were placed in the same box and were there in August, 1913. I am, therefore, driven to the conclusion that there was no delivery of the subject-matter of the so-called gift; that on that account, and for that reason, the gift was imperfect, and is therefore void.

I will advise a decree in accordance with this view.